# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1912V

|  |  |
|---|---|
| ASHLEY KOON,<br><br>                     Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                     Respondent. | Chief Special Master Corcoran<br><br>Filed: August 25, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Austin Joel Egan, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On December 21, 2020, Ashley Koon filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act").[3] Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA"), following the receipt of a tetanus, diphtheria, acellular pertussis ("Tdap") vaccine on July 30, 2020. Amended Petition at 1, ¶¶ 1, 9. After Respondent

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] More than eighteen months later, on July 8, 2022, Ms. Koon filed an amended petition. ECF No. 22.

conceded entitlement, the parties were unable to resolve damages on their own,[4] so I ordered briefing on the matter.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$137,066.59**, **representing $134,000.00 for actual pain and suffering, plus** $3,066.59 **for past unreimbursable expenses.**

### I.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and

---

[4] More than ten months after I determined Petitioner was entitled to compensation, the parties informed me that they had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed Apr. 29, 2024, ECF No. 45.
.

2

suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.    Prior SIRVA Compensation Within SPU[5]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2025, 4,983 SPU SIRVA cases have resolved since the inception of SPU more than ten years before. Compensation has been awarded in the vast majority of cases (4,817), with the remaining 166 cases dismissed.

2,744 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[6] In only 310 of these cases, however, was the amount

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 2,073 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

3

of damages determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *310* | *2,403* | *31* | *2,073* |
| **Lowest** | $25,000.00 | $4,000.00 | $37,013.60 | $1,000.00 |
| **1st Quartile** | $67,020.04 | $60,000.00 | $90,000.00 | $30,000.00 |
| **Median** | **$91,290.04** | **$79,444.74** | **$115,772.83** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $106,293.26 | $161,501.20 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 310 SPU SIRVA cases in which damages were determined via reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $25,000.00 to $215,000.00, with $90,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

---

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,403 cases) or stipulation (31 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

4

$250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.     The Parties' Arguments

The parties agree Petitioner should be awarded $3,066.59 for past unreimbursed expenses. Petitioner's Brief on Damages ("Brief") at 1, 15, 29, ECF No. 48; Respondent's Response to Petitioner's Brief in Support of Damages ("Opp.") at 2 n.2, ECF No. 50;

---

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

Petitioner's Reply to Opp. ("Reply") at 5, ECF No. 52. Thus, the only area of disagreement is the amount of compensation which should be awarded for Petitioner's pain and suffering. Petitioner seeks $145,000.00, and Respondent argues for an award of $105,000.00. Brief at 1, 15, 17, 27, 29; Opp. at 2, 15; Reply at 5.

Characterizing her SIRVA as "severe and debilitating," Petitioner maintains that it "has likely left her with life-long sequela." Brief at 20. She notes that she "endured numerous left shoulder examinations, received three left shoulder MRI's [sic] and a PET scan, underwent left shoulder surgery, was hospitalized on two occasions, had a PICC line placed in her arm for antibiotics, and participated in at least 57 physical therapy sessions over the course of two years" (*id.* at 19), adding that "none of the treatment . . . has led to her full recovery" (*id.* at 20). Although she acknowledges some improvement, Petitioner insists that "[t]here can be no dispute that [she] has suffered for years now from her SIRVA-related symptoms." *Id.* at 20.

In a supplemental declaration[12] filed with her damages brief, Petitioner describes the continued negative effects of her SIRVA, for example when walking her dog and during her wedding. Ex. 15 at ¶¶ 2-3. Maintaining that her injury prevented her from pursuing her planned profession in the theater (as an actress and dancer), and engaging in yoga (her preferred exercise) Petitioner shares her concerns for the future, such as a fear that she will be unable to properly care for any children she may have. *Id.* at ¶ 4; *see also* Ex. 10 at ¶¶ 6-10 (initial signed declaration).[13]

Petitioner favorably compares her circumstances with those of the claimants in *Reed, Binette, Dawson-Savard,* and *Rafferty*[14] – decisions featuring past pain and suffering awards ranging from $127,500.00 to $160,00.00. Brief at 22-25. She also references multiple cases involving arthroscopic surgery and past awards of $125,000.00[15] (Brief at 25), distinguishing them from her circumstances due to the

---

[12] The supplemental declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Ex. 15.

[13] The initial declaration also was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Ex. 10.

[14] *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Feb. 1, 2019) (awarding $160,000.00 for past pain and suffering); *Binette v. Sec'y of Health & Hum. Servs.,* No. 19-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $130.000.00 for past pain and suffering and $1,000.00 per year for future pain and suffering); *Dawson-Savard v. Sec'y of Health & Hum. Servs.,* No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020) (awarding $130,000.00 for past pain and suffering and $500.00 per year for future pain and suffering); *Rafferty v. Sec'y of Health & Hum. Servs.,* No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) (awarding $127,500.00 for past pain and suffering).

[15] *Stokes v. Sec'y of Health & Hum. Servs.,* No. 19-0752V, 2021 WL 6550888 (Fed. Cl. Spec. Mstr. Dec. 17, 2021); *Roberson v. Sec'y of Health & Hum. Servs.,* No. 19-0090V, 2020 WL 5512542 (Fed. Cl. Spec.

complications she experienced requiring more invasive treatment (placement of a PICC line and acute hospitalizations) and "uniquely rigorous course of physical therapy" (*id.* at 26). Petitioner argues that her "pain and dysfunction over the course of almost four years merits the requested award." *Id.* at 20.

Respondent portrays Petitioner's treatment as more limited, arguing that she attended only 43 PT sessions (Opp. at 12), and that her "hospitalizations and subsequent visits . . . were only tangentially related to her vaccine injury" (*id.* at 13). Insisting that Petitioner actively treated for only eight and a half months, and that later PT sessions were focused on an unrelated condition (lower back pain) and showed a lack of left shoulder impairment, Respondent disputes the longer SIRVA duration Petitioner claims. *Id.* at 13. He contends that Petitioner's return for treatment, following a gap of more than two years, was "to document an ongoing injury for the purpose of damages and not to treat an injury." *Id.* at 14. Accordingly, "for purposes of damages, [P]etitioner's treating course for her injury should not extend beyond April 2021." *Id.*

Emphasizing the greater number of received steroid injections in several of the surgical cases with $125,000.00 awards cited by Petitioner, as well as the greater amount of PT in another, Respondent argues that Petitioner's pain and suffering award should be less. Opp. at 14-15. Instead, he proposes as comparable matters *Wylie, Gray,* and *Richardson*[16] – decisions featuring past pain and suffering awards ranging from $108,000.00 to $112,000.00. Opp. at 15.

In her reply, Petitioner counters Respondent's arguments related to her hospitalizations and later gap in treatment. She "strongly objects to [R]espondent's attempt to characterize [her] two hospitalizations as 'tangentially related to her vaccine injury,'" (Reply at 1 (quoting Opp. at 13)), insisting that because "it was not sepsis causing petitioner's shoulder pain at that time . . . it cannot be concluded that [P]etitioner was hospitalized for an alternate condition other than the pain and suffering directly related to her SIRVA" (Reply at 2). Regarding Respondent's emphasis of her more than two-year treatment gap (from April 2021, through August 2023), Petitioner explains that she "moved from her home in Seattle, Washington to Washington, D.C. in August 2021, to

---

Mstr. Aug. 7, 2020); *Drake v. Sec'y of Health & Hum. Servs.,* No. 18-1747V, 2020 WL 4674105 (Fed. Cl. Spec. Mstr. July 7, 2020); *Wallace v. Sec'y of Health & Hum. Servs.,* No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019); *Dobbins v. Sec'y of Health & Hum. Servs.,* No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018).

[16] *Wylie v. Sec'y of Health & Hum. Servs.,* No. 20-1314V, 2022 WL 17968929 (Fed. Cl. Spec. Mstr. Dec. 7, 2022) (awarding $108,000.00 for past pain and suffering); *Gray v. Sec'y of Health & Hum. Servs.,* No. 20-1708V, 2022 WL 6957013 (Fed. Cl. Spec. Mstr. Sept. 12, 2022) (awarding $110,000.00 for past pain and suffering; *Richardson v. Sec'y of Health & Hum. Servs.,* No. 20-0674V, 2023 WL 6180813 (Fed. Cl. Spec. Mstr. Aug. 16, 2023) (awarding $112,000.00 for past pain and suffering).

begin an intensive two-year graduate course of study at American University" (Reply at 2), adding that she also worked 40 hours a week at the American Red Cross headquarters and had medical insurance with a very high deductible at that time. *Id.* at 2-3.

To support her assertion of ongoing symptoms, Petitioner provides a letter from the PCP she first saw in 2022, stating that, although her "appointments were primarily for depression and PMS symptoms, we often discussed her shoulder pain as a result of her TDAP vaccine." Ex. 17 at 1; *see also* Ex. 13 (records from visits with this PCP).

### IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the filed medical records, affidavits, and sworn declarations and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Ms. Koon (age 27) suffered severe inflammation of her left shoulder joint, resulting in moderate to severe pain levels and substantial reductions in ROM. After gaining minimal temporary relief from prescribed Percocet and oral steroids,[17] she attempted PT, attending only three sessions before being discharged due to an exacerbation, rather than easing, of her symptoms.[18] Approximately one-month post-vaccination, Petitioner underwent arthroscopic surgery, consisting of debridement and irrigation. Ex. 5 at 198-99.

Following surgery, Petitioner continued to experience inflammation. She remained in the hospital for four days post-surgery and had a PICC line installed to administer

---

[17] Petitioner was prescribed Percocet at her initial PCP visit on August 10, 2020, and a Medrol Dosepak (oral steroids) at her next visit on August 17, 2020. Ex. 5 at 158, 156 (respectively). Percocet is the trademark for a combination of oxycodone hydrochloride and acetaminophen. 1409. At an appointment on September 4, 2020, she reported "some relief" from the prescribed oral steroids, but a return of pain once she stopped taking the oral steroids. Ex. 5 at 151.

[18] At her third PT session on August 26, 2020, Petitioner reported increased pain, due in part to movements performed the previous day at an orthopedic appointment and pain "all the time." Ex. 2 at 22. After showing "poor tolerance to therapy" (*id.*), she was discharged from PT three days later (*id.* at 20). Her pain levels were noted to be three at rest and nine during activity. *Id.*

8

antibiotic infusions. Ex. 5 at 57. After her discharge, she was hospitalized again from September 27 through October 2, 2021, for a fever, chills, and rash. Ex. 5 at 17-28, 46-55. She participated in occupational therapy ("OT") while hospitalized post-surgery[19] and PT thereafter.[20] Six weeks post-surgery, the antibiotics were stopped, and Petitioner began complaining of lower back and hip pain in addition to her left shoulder pain. Ex. 5 at 13. She made good, albeit slow, progress while attending 43 PT sessions over a five-month period (from mid-September 2020, through mid-February 2021). Ex. 2 at 37-155.

Respondent argues that I should not consider all treatment received by Petitioner during this time, specifically the hospitalizations, when determining her pain and suffering award. Opp. at 12-13. And there was some initial confusion on the part of Petitioner's treating physicians as to the exact nature of her condition. *See*, e.g., Ex. 5 at 132, 198. They believed Petitioner may have suffered from sepsis or septic arthritis,[21] but this diagnosis was ultimately eliminated. *See, e.g., id.* at 132. And the medical records contain multiple statements from different treating physicians attributing the symptoms Petitioner experienced to the vaccine she received. *E.g.,* Ex. 5 at 63.

Even the back and hip pain that began post-surgery *may* have been connected to her shoulder condition.[22] And the small Hill-Sachs defect with labral tear revealed on the MRI performed in August 2020, thought to be due to a past shoulder dislocation, possibly

---

[19] At her initial OT evaluation on September 5, 2020, the day after surgery, Petitioner reported pain at a level of three to four at rest ad six to seven with movement. Ex. 5 at 64. She was assessed as needing a little help with daily tasks, specifically bathing, grooming, eating, and putting on and taking off clothing. *Id.* at 65. Petitioner attended a second OT session on September 6, 2020, and was discharged with home exercises and instructions to continue therapy. *Id.* at 60, 66-67. Her overall rehab potential was noted to be good. *Id.* at 67.

[20] At her first out-patient PT session on September 17, 2020, Petitioner described her left shoulder as "still hurt[ing] but not as bad as before." Ex. 2 at 137. She estimated her pain as three at rest and seven with activity. *Id.* By her fifth session on October 6, 2020, she reported "feeling much better lately." *Id.* at 129. Petitioner continued to experience difficulties with movement in October 2020, and to experienced lower back pain, likely attributed to both a prior injury and possibly her current lack of movement and compensating actions. *Id.* at 117, 120. At her twelfth visit on November 3, 2020, Petitioner described an aggravation of her condition following a "small" motor vehicle accident the previous day. *Id.* at 114. By late November, Petitioner was able to run again. *Id.* at 101. She continued to suffer minor setbacks in December and January, for example when attempting to pick up a small child or going on a run. *E.g., id.* at 89, 63 (in chronologic order). By her 40th and last PT session on February 18, 2021, Petitioner reported feeling better with no pain at rest. *Id.* at 47.

[21] Sepsis refers to "the presence in the blood or other tissues of pathogenic microorganisms or their toxins. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1693 (32th ed. 2012). And septic arthritis is "a type of infectious arthritis, usually acute, characterized by inflammation of the synovial membranes with purulent effusion into a joint or joints." DORLAND'S at 157.

[22] When complaining of pain in her lower back and extremities on October 7, 2020, Petitioner "relate[d] her . . . pain to less activity as a result of shoulder pain and limited exercise, since she previously was running and professionally dancing/performing theater." Ex. 5 at 13. She referenced a prior fracture at the L5 when discussing this back pain during a PT assessment in mid-October 2020. Ex. 2 at 120.

from her history as a dancer, was not thought to be the primary source of her pain. *See* Ex. 2 at 261 (MRI results). Thus, Respondent's argument that the whole of Petitioner's pain and suffering should not be attributed to her SIRVA is unpersuasive.

Unlike most petitioners who undergo arthroscopic surgery, Petitioner did not obtain immediate relief thereafter. She showed slow improvement during 40 PT sessions thereafter. *See supra* note 20. Even after ceasing PT (in mid-February 2021), Petitioner continued to experience some pain and limitations in ROM. At her last visit in 2021, with her PCP on April 12, 2021, she described her pain as waxing and waning, reporting that massage therapy helped but was expensive, and she was considering manipulation under general anesthesia. Ex. 5 at 93-94. Her PCP recommended Petitioner try Voltaren gel, and noted Petitioner had been accepted into the Masters Program for Public Administration at American University. *Id.* at 94.

The evidence supports Petitioner's assertion that she experienced some symptoms thereafter, but not necessarily at the level she contends. She has offered credible explanations for her failure to seek treatment from April 2021 to June 2022. Although the medical records from visits with her new PCP in Washington, D.C. during June through September 2022, were for treatment of depression and fatigue (Ex. 12 at 13-32), the PCP provided a letter stating that she recalled discussing Petitioner's shoulder pain following the Tdap vaccine at those visits. Ex. 17 at 1. Petitioner sought treatment from this PCP in August 2023, and an orthopedist in 2024, but it is important to note that these visits occurred not only after this claim was filed, but also after Respondent conceded entitlement. *Compare* Ex. 12 at 8-11 (PCP visit); Ex. 14 at 1-3 (orthopedic visit) *with* Ruling on Entitlement, issued June 22, 2023, ECF No. 31. Thus, while I credit Petitioner's claim of symptoms beyond April 2021, I find they were not severe enough to require significant treatment and thus, do not substantially impact her award.

Several cases Petitioner cites do not offer helpful comparisons. Due in part to their not being good candidates for surgery, the petitioners in *Binette* and *Dawson-Savard* suffered SIRVAs involving somewhat consistent and severe pain levels and diminished ROM for more extended periods of time than usual. *Binette,* 2019 WL 1552620, at *13-14; *Dawson-Savard,* 2020 WL 4719291, at *2-3. Both petitioners' injuries were later determined to be permanent. *Binette,* 2019 WL 1552620, at *14; *Dawson-Savard,* 2020 WL 4719291, at *3. Thus, the circumstances in these cases are too dissimilar to those experienced by Petitioner.

The cases Respondent offers, however, are similarly unhelpful. All involved petitioners who gained good relief within a year of arthroscopic surgeries performed three to seven months post-vaccination. *Wylie*, 2022 WL 17968929, at *6*; Gray*, 2022 WL 6957013, at *6*; Richardson*, 2023 WL 6180813, at *8-9.

10

The *Reed* and *Rafferty* decisions are most instructive for present purposes, and the circumstances of those cases dictate an award that falls within the range they represent. The *Reed* petitioner suffered severe pain levels for approximately six months before undergoing arthroscopic surgery. *Reed,* 2019 WL 1222925, at *3-4, 16. Post-surgery, she consistently pursued treatment for more than two years, and suffered the added difficulty of caring for her two young children, one of which is autistic. *Id.* at *15-16. These factors equate to a greater award than is warranted in this case.

Although I find the pain and suffering experienced by the *Rafferty* petitioner to be slightly less, the facts and circumstances in that case most closely mirror those experienced by Petitioner. Both petitioners endured severe suffering prior to surgery, moderate relief thereafter, and only lingering symptoms - not requiring extensive treatment, beyond a year post-vaccination. *Rafferty,* 2020 WL 3495956, at *15-16. Although the *Rafferty* petitioner did not undergo surgery until five months post-vaccination, her complications thereafter were less severe. *Id.* Thus, Petitioner's award should be similar, albeit slightly greater.

The *Leslie* case – involving a pain and suffering award of $125,000.00 - also provides a helpful comparison. *Leslie v. Sec'y of Health & Hum. Servs.,* No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021). It too involved an uncommon injury, bone erosion at the humeral head after an incorrectly administered vaccine. *Id.* at *2-4. In *Leslie,* I determined that the "reasonable uncertainty surrounding his continued bone erosion and possibility of an ongoing infection . . . added to his pain and suffering." *Id.* at *10. And Petitioner in this case endured similar uncertainty. According to the guidance offered by these last three decisions – *Reed, Rafferty,* and *Leslie*, I find that $134,000.00 is an appropriate pain and suffering award in this case.

## Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I find that $134,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[23] I also find that Petitioner is entitled to $3,066.59 in actual unreimbursable expenses.**

---

[23] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

11

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $137,066.59 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[24]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.